HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES FOR THE USE
AND BENEFIT OF CK ONE
CONSULTING SERVICES, INC.,

　　　　　　Plaintiffs,

　　　　v.

A.W. SCHELL ELECTRIC
SERVICES, INC. et al.,

　　　　　　Defendants.

CASE NO. C13-408 RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on the motion for summary judgment filed by defendants A.W. Schell Electrical Services, Inc. ("Schell"), Andy Schell, Jane Doe Schell, and Hanover Insurance Company ("Hanover") (Dkt. # 18), and plaintiff CK One Consulting Services dba Atlas Power Corp.'s ("Atlas") motion for partial summary judgment against Hanover (Dkt. # 22).  The court has considered all of the evidence presented together since many of the issues overlap.  Plaintiff alleges eight causes of action:  (1) Breach of Contract, (2) Quantum Meruit, (3) Conversion, (4) Fraudulent Misrepresentation, (5) Unjust Enrichment, (6) Negligent Misrepresentation, (7) Miller Act Payment Bond, and (8) Trade Libel.  The first, second, fifth, and seventh claims arise

1  out of Schell's alleged failure to pay for labor, services and materials provided by Atlas.

2  Dkt. # 1 (Compl.) ¶¶ 3.3, 3.9, 3.20, 3.26.

3       Neither party requested oral argument, and the court finds that this matter may be

4  decided on the materials submitted.  Having reviewed the memoranda, exhibits, and the

5  record herein, the court GRANTS defendants' summary judgment motion, and DENIES

6  plaintiff's motion for partial summary judgment.

7                              **II. BACKGROUND**

8       In January 2012, Schell was awarded a government contract with the U.S. Army

9  Corp of Engineers to provide labor and materials for the Chief Joseph Dam in Douglas

10 County, Washington.  Dkt. # 19 (Schell Decl.) ¶ 2.  In order to complete the labor and

11 materials for the project, Schell entered into a subcontract ("Subcontract") with Atlas.[1]

12 *Id.* ¶ 3.  In July 2012, Schell informed Atlas that all submittals had been provided to the

13 Army Corp with all documentation needed to begin work on the project.  Dkt # 22-1 at 5

14 (Ex. A to Pl.'s Mot., 1st Kuhnert Decl.).  When Mr. Kuhnert went to the site, Schell

15 representatives asked Mr. Kuhnert to assist them with their submittals and other work,

16 which was not part of the subcontract.  *Id.*  Mr. Kuhnert assisted Schell in performing the

17 submittals and other work.[2]  *Id.*

18      On November 1, 2012, Atlas sent Schell a letter that stated, among other things,

19 that its "invoices, present and future, have been assigned to, and are now payable only to

20 Avalon Funding Corporation" and that the "instruction will remain in effect until revoked

21 by Avalon in written notification."  Dkt. # 19 at 31 (Ex. B to 1st Schell Decl.).   On the

22

23      [1] The parties dispute whether the subcontract is valid because of an email in which Mr.
24 Schell stated that the subcontract "was never signed by an authorized person at [Schell]" and that
   the "signing power is held only by officers in this corporation, which is myself."  Dkt. # 27-1 at 7
25 (Ex. C to Plf.'s Opp'n).  Mr. Schell now states that he directed Dan Baker, the project manager,
   to sign the subcontract.  Dkt. # 19 (Schell Decl.) ¶ 3.  The court has addressed the admissibility
26 of this document below.
      [2] The parties dispute whether the submittals had been submitted and whether the
27 additional work was outside the scope of the subcontract.

ORDER- 2

1  same day, Atlas issued two invoices to Schell for $254,116.83 (No. CJD102212) and

2  $361,068.88 (No. cjd102212-1), respectively. *Id.* at 33-34 (Ex. C to 1st Schell Decl.).

3  In December 2012 and January 2013, Atlas delivered labor and materials to

4  Schell. Dkt. # 30 at 2-3 (Taylor Decl.); Dkt. # 34 at 2-3 (Eurick Decl.). Atlas claims that

5  delays in delivery were caused by Schell, weather, and the freight company (*Id.*), and

6  Schell claims that the items delivered and the labor performed did not comply with the

7  Subcontract (Dkt. # 26 (2d Schell Decl.) ¶¶ 9-12)). On February 27, 2013, Schell sent

8  Atlas a letter in response to recent correspondence it had with Avalon and Atlas's

9  demands for payment of the two invoices issued on November 1, 2012. *Id.* at 7-13 (Ex.

10  A to 2d Schell Decl.). In that letter, Schell stated that it intended to withhold payment

11  based on "numerous material defaults under the Subcontract." *Id.* Atlas did not respond

12  to this letter. *Id.* at 4 ¶ 9. On March 7, 2013, Atlas filed its complaint against defendants.

13  Dkt. # 1. On March 27, 2013, Schell "terminated Atlas'[s] contract for Atlas'[s] failure

14  to cure material defaults." Dkt. # 19 (1st Schell Decl.) ¶ 6. On May 19, 2013, Avalon

15  sent Atlas a notice of default and demand for payment pursuant to the Purchase and

16  Security Agreement. Dkt. # 29-1 at 2-3 (Ex. A to Plf.'s Reply). On May 22, 2013,

17  Schell, Avalon and Atlas (by Avalon as power of attorney for Atlas)[3] entered into a

18

19

20  [3] On January 29, 2010, Atlas executed a Special Power of Attorney ("Power of Attorney") that appointed Avalon Funding Corporation ("Avalon") as its "attorney in fact to act in [Atlas's] place" to, among other things, compromise, prosecute, or defend any action, claim, proceeding or dispute relating to any accounts receivable, sold and/or assigned to Avalon under the Accounts Receivable Purchase and Security Agreement ("Purchase and Security Agreement") entered into between Atlas and Avalon. Dkt. # 24-2 at 2 (Ex. B to Avalon Decl.); Dkt. # 27-1 at 2 (Ex. A to Plf.'s Opp'n). The Power of Attorney remained in effect until all of Atlas's obligations to Avalon under the Purchase and Security Agreement had been satisfied. *Id.* On the same day, Atlas also executed a separate assignment ("Assignment") that "assign[ed] all of its right, title and interest in all of its commercial Accounts Receivable to" Avalon. Dkt. # 24-1 at 2 (Ex. A to Avalon Decl.). The Purchase and Security Agreement governs the accounts receivable purchased by Avalon, and requires, among other things, Atlas to notify each account debtor that all payments must be made to Avalon. Dkt. # 28 at 12 (Ex B to 2d Kuhnert Decl., § 2.1); Dkt. # 33 at 5 (Ex. A to Supp. Avalon Decl., signature page).

21

22

23

24

25

26

27

1   settlement agreement ("Settlement Agreement"), by which they released all claims

2   against each other related to the accounts receivable that Atlas assigned to Avalon.[4]  Dkt.

3   # 19 at 38-45 (Ex. E to 1st Schell Decl.).  Pursuant to the Settlement Agreement, Schell

4   paid Avalon $495,000.  *Id.* at 3 ¶ 7.

5        On June 13, 2013, Atlas issued a third invoice (No. M021113), which repeated

6   entries from the prior two invoices, but also included new entries for shipping,

7   consulting, interest, storage, collection fees, and sales tax, totaling an additional

8   $263,292.  Dkt. # 20 at 25-26 (Ex. C to Godwin Decl.).

### III. ANALYSIS

10       Summary judgment is appropriate if there is no genuine dispute as to any material

11  fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

12  56(a).  The moving party bears the initial burden of demonstrating the absence of a

13  genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

14  Where the moving party will have the burden of proof at trial, it must affirmatively

15  demonstrate that no reasonable trier of fact could find other than for the moving party.

16  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

17  the nonmoving party will bear the burden of proof at trial, the moving party can prevail

18  merely by pointing out to the district court that there is an absence of evidence to support

19  the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving party meets

20  the initial burden, the opposing party must set forth specific facts showing that there is a

21  genuine issue of fact for trial in order to defeat the motion.  *Anderson v. Liberty Lobby,*

22  *Inc.*, 477 U.S. 242, 250 (1986).  The court must view the evidence in the light most

23  favorable to the nonmoving party and draw all reasonable inferences in that party's favor.

24  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

25

26       [4] Atlas did not sign the Settlement Agreement in its own right, and challenges Avalon's

27  authority to sign on its behalf.

## A. Motions to Strike

As a preliminary matter, defendants make a number of motions to strike inadmissible evidence, to which plaintiff provides no substantive response. Far from "sophistical argumentation and cheap legal maneuverings" or "smoke and mirrors, and other juridical wizardry," as plaintiff contends, defendants' motions are rooted firmly in the Federal Rules of Evidence and binding precedent.

In resolving a motion for summary judgment, the court may only consider admissible evidence. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). However, at the summary judgment stage, a court focuses on the admissibility of the evidence's content, not on the admissibility of the evidence's form. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

Defendants move to strike various statements that appear in plaintiff's briefing that, purportedly, are not supported by admissible facts. Dkt. # 25 at 3-4. The court has only considered admissible evidence. To the extent that plaintiff makes assertions that are not supported by the record, the court has disregarded them.

Defendants also move to strike various statements in the declarations of Mr. Kuhnert based on lack of personal knowledge and hearsay. Dkt. # 25 at 4-5; # 31 at 3-4. Rather than limit his declarations to statements of fact of which he has personal knowledge, the vast majority of Mr. Kuhnert's declarations consists of argument, analysis and interpretation of other evidence, improper opinion testimony, speculation, hearsay, and legal conclusions. Fed. R. Evid. 602, 701, 702, 801. The court has only considered statements of fact that appear to be within Mr. Kuhnert's personal knowledge and that are not hearsay.

Defendants move to strike a number of unauthenticated documents that lack appropriate foundation by a person with personal knowledge. Dkt. # 31 at 2 (moving to strike Exs. B, C, and D to Plf.'s Opp'n at Dkt. # 27-1); Dkt. # 36 at 2 (moving to strike Ex. C to Plf.'s Reply at Dkt. # 29-1). The court agrees that these documents are not

properly authenticated and lack appropriate foundation by a person with personal
knowledge.  However, with respect to Exhibit C to Dkt. # 27-1, it appears that Mr.
Kuhnert received a copy of the email.  Accordingly, the court believes that Mr. Kuhnert
could authenticate the document and provide proper foundation for its admissibility.
With respect to Exhibit C to Dkt. # 29-1, it also appears that Mr. Kuhnert could lay the
proper foundation for its admissibility where it appears that he requested a certified copy
of all financing statements and non-UCC liens for Schell that had been filed with the
Washington State Department of Licensing.   Accordingly, the court focuses on the
admissibility of the evidence's content with respect to these two exhibits, not their form.

Defendants also argue that Exhibit C to Dkt. # 29-1 is hearsay offered to prove the
truth of the matter therein—that Atlas filed a financing statement to perfect a security
interest on Schell.  Dkt. # 36 at 3.  Defendants are mistaken.  Plaintiff has provided this
exhibit to demonstrate the notice to and effect of the UCC financing statement on Schell.
Dkt. # 29 at 6.  Accordingly, this Exhibit is not offered for the truth of the matter
asserted.

Accordingly, the court GRANTS defendants' motions to strike Exhibits B and D
to Dkt. # 27-1, and DENIES the motions with respect to Exhibits C to Dkt. ## 27-1 and
29-1.

Plaintiff moves to strike Avalon's declaration based on lack of foundation, legal
conclusions and improper opinion testimony because "this declaration is being provided
to establish that the 'Special Power of Attorney' that Plaintiff signed with Avalon is
valid."  Dkt. # 27 at 11.  Plaintiff has not identified any legal conclusion or improper
opinion testimony that Mr. Haldeman purportedly makes on Avalon's behalf.  Contrary
to plaintiff's interpretation of the declaration, Mr. Haldeman does not state that the Power
of Attorney is valid.  Rather, Mr. Haldeman states that "Avalon did not revoke the
Special Power of Attorney" and that "Avalon did not waive its rights under the Special
Power of Attorney."  Mr. Haldeman does not state, as defendants contend, that Avalon

1   "did not make any statement or conduct any act that waives or revokes the Special Power

2   of Attorney."  Dkt. # 31 at 9.  Rather, Mr. Haldeman took the next step and provided the

3   legal conclusion that Avalon did not revoke or waive its rights under the Power of

4   Attorney.  Accordingly, the court has disregarded these legal conclusions in Mr.

5   Haldeman's declaration on behalf of Avalon.

6   **B.  The Miller Act**

7          The Miller Act requires a general contractor on a federal construction project to

8   furnish a payment bond for the protection of all persons supplying labor and material in

9   carrying out the work provided for in the contract.  40 U.S.C. § 3131[5]; *Mai Steel Serv.*

10  *Inc. v. Blake Constr. Co.*, 981 F.2d 414, 416 (9th Cir. 1992).  The Miller Act represents a

11  congressional effort to protect persons supplying labor and material for the construction

12  of federal public buildings in lieu of the protection they might receive under state statutes

13  with respect to the construction of nonfederal buildings.  *Mai Steel*, 981 F.2d at 416-17.

14  "Because the Act is 'highly remedial in nature,' it must be liberally construed to

15  effectuate Congress's intent."  *Id.* at 417.  "Every person that has furnished labor or

16  material in carrying out work provided for in a contract for which a payment bond is

17  furnished under section 3131" may recover against a surety where payment has not been

18  made in full within 90 days the last day the labor or material was supplied.  40 U.S.C.

19  § 3133(b)(1); *Mai Steel*, 981 F.2d at 417.  This includes any subcontractor who deals

20  directly with the prime contractor as well as any sub-subcontractor who has supplied

21  labor or materials to a subcontractor.  *Mai Steel*, 981 F.2d at 417.  Additionally, when a

22  subcontractor's claim falls within the Miller Act, the subcontractor may recover from the

23  general contractor's Miller Act surety all of its increased labor and material costs

24  resulting from construction delays for which it is not responsible, even if those delays are

25  caused by someone other than the general contractor.  *Id.* at 420.

26  _____

27          [5] This section was formerly cited as 40 U.S.C. 270a.

ORDER- 7

1    "The Miller Act provides a federal cause of action, and the scope of the remedy as

2    well as the substance of the rights created thereby is a matter of federal not state law."

3    *F.D. Rich Co. v. U.S. ex rel. Indus. Lumber Co., Inc.*, 417 U.S. 116, 127 (1974).

4    However, state law controls the interpretation of Miller Act subcontracts to which the

5    United States is not a party.  *U.S. ex rel. Reed v. Callahan*, 884 F.2d 1180, 1185 (9th Cir.

6    1989).  Plaintiff does not dispute that Washington State law applies to the interpretation

7    of the Power of Attorney, Purchase and Security Agreement, Assignment, Settlement

8    Agreement, and Subcontract.  *See Barr v. Interbay Citizens Bank of Tampa, Fla.*, 96

9    Wash. 2d 692, 696, 635 P.2d 441 (Wash. 1981) ("In determining the appropriate choice

10   of law, this court has rejected the lex loci delicti choice-of-law rule and has adopted the

11   most significant relationship rule for contracts and tort choice-of-law problems.").

12   Additionally, the Supreme Court and other federal courts have indicated that the Miller

13   Act does not alter the generally accepted principles of law governing the assignment of

14   claims.  *See United States ex rel Sherman v. Carter*, 353 U.S. 210, 219 (1957) (noting

15   that there is nothing in the language, legislative history, or related decisions that indicated

16   that Congress intended to overturn cases that allowed assignees of the claims of persons

17   furnishing labor or material to bring a civil action under the Heard Act, which was

18   replaced with broader and more liberal provisions of the Miller Act); *Nickell v. United*

19   *States ex rel. D.W. Falls, Inc.*, 355 F.2d 73, 76 (10th Cir. 1966) ("It is not shown,

20   however, that the Miller Act in any way varies the generally accepted principles of law

21   governing the assignment of claims including the rule that the assignee takes the rights of

22   the assignor, and the assignment neither improves nor diminishes the value or validity of

23   those rights.").

24        Much of the disputes between the parties centers on the scope and interpretation of

25   various contracts, including the Power of Attorney, Purchase and Security Agreement,

26   Assignment, Settlement Agreement, and Subcontract.  Washington follows the objective

27   manifestation theory of contracts.  *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154

1   Wash. 2d 490, 503, 115 P.3d 262 (2005).  In determining the parties' intent, the court

2   focuses on the objective manifestations of the agreement, rather than on the unexpressed

3   subjective intent of the parties.  *Id.*  The court imputes an intention corresponding to the

4   reasonable meaning of the words used.  *Id.*  Thus, the subjective intent of the parties is

5   generally irrelevant if the intent can be determined from the actual words used.  *Id.* at

6   504.  Words in a contract are given their ordinary, usual, and popular meaning unless the

7   entirety of the agreement clearly demonstrates a contrary intent.  *Id.*  The court must also

8   view the contract as a whole and the parties' conduct in determining intent.  *King v. Rice*,

9   146 Wn. App. 662, 670, 191 P.3d 946 (2008).

10          On January 29, 2010, Atlas executed the Power of Attorney that appointed Avalon

11  as its "attorney in fact to act in [Atlas's] place" for four specific purposes:

12          1. To endorse its name to checks, drafts, or other instruments payable to it,
13          to receive cash therefore, and/or to deposit to Avalon's account or to any
            other account which Avalon may designate;
14
15          2. To contact account debtor(s) on behalf of the undersigned, orally or in
            writing, to verify account(s) receivable, documents related thereto, to
16          specify and confirm mode of payment and otherwise take such action to
            ensure payment on account(s) receivable and protection of collateral related
17          thereto;
18
19          3. To compromise, prosecute, or defend any action, claim, proceeding or
            dispute relating to any account(s) receivable, sold and/or assigned to
20          Avalon under that certain "Accounts Receivable Purchase and Security
            Agreement" entered into between the undersigned and Avalon.
21
22          4. To receive, open and dispose of all mail, delivered by private carrier or
            the U.S. postal Service, sent to the undersigned and/or Avalon.
23  Dkt. # 27-1 at 2 (Ex. A to Plf.'s Opp'n).  The Power of Attorney also provides that Atlas

24  "further grants to its attorney in fact full authority to act in any manner both proper and

25  necessary to the exercise of the foregoing powers, and hereby ratifies every act that

26  Avalon may lawfully perform in exercising those powers."  *Id.*  Finally, the Power of

27

1   Attorney became effective on January 29, 2010, and "remain[ed] in full force and effect

2   until all obligations of [Atlas] to Avalon under that certain Accounts Receivable Purchase

3   and Security Agreement entered into between [Atlas] and Avalon have been satisfied in

4   full." *Id.*

5          Plaintiff also executed a separate Assignment consistent with the Purchase and

6   Security Agreement and the Power of Attorney that "assign[ed] all of its right, title and

7   interest in all of its commercial Accounts Receivable to" Avalon.  Dkt. # 24-1 at 2 (Ex. A

8   to Avalon Decl.).  The Assignment also provides that "Avalon has purchased said

9   receivables, acting for its own account and has advanced the necessary funds to purchase

10  said accounts, pursuant to the Avalon Schedule of Accounts, which has been entered into

11  concurrently with this Assignment."  *Id.*  The Assignment also provides that Atlas "shall

12  and does assign, sell and transfer all of its rights, title and interest in all of the Accounts

13  Receivable sold and assigned to [Avalon] . . . ."  *Id.*

14         The intent of the parties is clear and unambiguous from the actual words used.[6]

15  The Power of Attorney was intended to grant fairly broad authority on Avalon to "act in

16  any manner proper and necessary to" accomplish the four purposes, including the ability

17  of Avalon to "compromise, prosecute, or defend any action, claim, proceeding or

18  dispute" relating to the purchased accounts receivable, which have been assigned to

19  Avalon.  Additionally, the Power of Attorney does not terminate until the obligations

20  under the Purchase and Security Agreement have been satisfied in full.

21         The Purchase and Security Agreement, entered into between Avalon and Atlas on

22  January 29, 2010, governs the accounts receivable purchased by Avalon, and requires

23  Atlas to notify each account debtor that all payments must be made to Avalon.  Dkt. # 28

24  at 12 (Ex B to 2d Kuhnert Decl., § 2.1); Dkt. # 33 at 5 (Ex. A to Supp. Avalon Decl.,

25

26  _____

27         [6] Thus, plaintiff's subjective intent is irrelevant.

ORDER- 10

1    signature page).[7]  On November 1, 2012, Atlas provided this required notice to Schell,

2    the account debtor, and informed Schell that its "invoices, present and future, have been

3    assigned to, and are now payable only to Avalon Funding Corporation" and that the

4    "instruction will remain in effect until revoked by Avalon in written notification."  Dkt. #

5    19 at 31 (Ex. B to 1st Schell Decl.).   On the same day, Atlas issued two invoices to

6    Schell for $254,116.83 (No. CJD102212) and $361,068.88 (No. cjd102212-1),

7    respectively.  *Id.* at 33-34 (Ex. C to 1st Schell Decl.).  On June 13, 2013, three months

8    after this case was filed, Atlas issued a third invoice (No. M021113), which largely

9    repeats entries from the prior two invoices.[8]  Dkt. # 20 at 25-26 (Ex. C to Godwin Decl.).

10   However, it also includes seven new entries for shipping, consulting, interest, storage,

11   collection fees and sales tax, totaling an additional $263,292.  *Id.*

12       The court finds that all three invoices are "commercial Accounts Receivable"

13   subject to the Assignment, Power of Attorney, and Purchase and Security Agreement.

14   *Compare* Dkt. # 19 at 40, 45 (Ex. E to 1st Schell Decl., May 2013 Settlement Agreement)

15   (agreeing to $495,000 payment by Schell to Avalon to settle claims related to assigned

16   accounts receivable) *with* Dkt. # 20 at 26 (Ex. C to Godwin Decl., June 2013 Invoice No.

17

18   _____

19       [7] Atlas does not dispute that it signed the Purchase and Security Agreement in January
     2010.

20       [8] Although Atlas contends in its interrogatories that the third invoice "cancels" the first
     two, Atlas has not provided the court with any legal or factual authority to support such a

21   conclusion.  *See* Dkt. # 20 at 15-16 (Ex. B to Godwin Decl., Interrog. 7).  Nor has Atlas provided
     the factual basis for its conclusion that Schell had notice of the "master invoice M021113" at any

22   time prior to June 2013.  *Id.* Atlas contends that this master invoice was created in February
     2011.  *Id.* However, there is no other evidence that supports a February 2011 date for the master

23   invoice.  The earliest date the court has received on the actual invoice bears a June 2013 date.  *Id.*
     at 25-26 (Ex. C to Godwin Decl.); *see also* Dkt. # 22-3 at 6 (Ex. C to Plf.'s Mot., 11/1/2013

24   date).  On a March 7, 2013 communication from Atlas to Schell regarding "Aging Report
     Amounts Owned [sic]," Atlas only identified the first two invoices, not the master invoice.  Dkt.

25   # 29-1 at 19 (Ex. B to Plf.'s Reply).  Had the master invoice been issued prior to March 7, 2013,
     Atlas would have included it in its Aging Report Amounts Owed letter.  Atlas cannot create a

26   disputed fact with conflicting evidence that it provides.  The court has used the June 2013 date
     for the third invoice.

27

1    M021113) (applying payment credit of $495,000 to account balance of the master

2    invoice).

3        The Purchase and Security Agreement also provides that "[e]ach purchase by

4    Avalon shall be a true purchase with transfer of all legal and equitable title and shall not

5    be deemed to be a loan agreement or secured transaction. [Atlas] shall thereafter have no

6    right, title, or interest in or to Purchased Accounts or payments thereof." Dkt. # 28 at 13

7    (Ex. B to 2d Kuhnert Decl., § 2.2). The Purchase and Security Agreement also contains a

8    power of attorney section that "irrevocably" appoints Avalon as Atlas's "true and lawful

9    attorney in fact, with respect to Purchased Receivables and authorizes [Avalon],

10   regardless of whether there has been an Event of Default," among other things "to

11   demand, collect, receive, sue, and give releases to any Account Debtor for the monies due

12   or which may become due upon or with respect to the Purchased Receivables and to

13   compromise, prosecute, or defend any action, claim, case or proceeding relating to the

14   Purchased Receivables . . ." and "to prepare, file and sign [Atlas]'s name on any notice,

15   claim, assignment, demand, draft or notice of or satisfaction of lien or mechanic's lien or

16   similar document[.]"  *Id.* at 15 (§ 5). Additionally, upon an Event of Default, Avalon

17   may "declare all Obligations immediately due and payable[,] . . . exercise all rights under

18   the power of attorney set forth in Section 5 above with respect to all Collateral and all

19   remedies set forth herein[, and] settle, compromise, adjust or litigate Receivables on such

20   terms as [Avalon] deems necessary to protect its rights . . . ." *Id.* at 17-18 (§ 10). Finally,

21   "any termination of [the] Agreement shall not affect [Avalon's] security interest in the

22   Collateral and [Avalon's] ownership of the Purchased Receivables, and this Agreement

23   shall continue to be effective, and [Avalon]'s rights and remedies hereunder shall survive

24   such termination, until all transactions entered into and Obligations incurred hereunder or

25   in connection herewith have been completed and satisfied in full." *Id.* at 19 (§ 13).

26       The objective intent of the parties regarding the Purchase and Security Agreement

27   is also clear and unambiguous from the actual words used. The parties unambiguously

1   agreed to allow Avalon the ability "to compromise" any claim relating to the accounts

2   receivable it purchased from Atlas, or to "settle, compromise, adjust or litigate

3   Receivables" in the event of a default.  There is also no ambiguity that Avalon has all

4   legal and equitable title to the purchased receivables, and that Atlas has "no right, title, or

5   interest in or to Purchased Accounts or payments thereof."  Finally, it is clear and

6   unambiguous that the parties intended Avalon's ownership of the accounts receivable to

7   be unaffected by any possible termination of the agreement until all obligations incurred

8   by Atlas had been satisfied in full.

9         Atlas seems to argue that Avalon's "Notice of Default" (Dkt. # 29-1 at 2-3)

10  somehow changed the parties' contractual obligations.  Dkt. # 29 at 3.  Specifically, Atlas

11  argues that "Avalon seemed to view the relationship between it and Atlas as one where

12  Atlas was obligated to repurchase the invoices and then collect on them by itself" and

13  that "[i]t was never Avalon's position that it had any independent right to settle the matter

14  with Schell."  *Id.*  However, the Purchase and Security Agreement expressly

15  contemplated Atlas's repurchase obligations and Avalon's recourse in the event of non-

16  payment or default.  Specifically, the parties agreed that (1) Atlas would repurchase "the

17  full face amount, or any unpaid portion of, any Purchased Receivable" that remains

18  unpaid for the payment period, (2) Avalon could "declare all Obligations immediately

19  due and payable[,]" (3) Avalon could "exercise all rights under the power of attorney set

20  forth in Section 5 above with respect to all Collateral and all remedies[,]" and, among

21  others, (4) Avalon could "settle, compromise, adjust or litigate Receivables on such terms

22  as Buyer deems necessary to protect its rights in said Receivables[.]"  Dkt. # 28 at 15, 17-

23  18 (Ex. B to 2d Kuhnert Decl., Purchase and Security Agreement §§ 4.1.1, 5, 10).

24        Nothing in the Notice of Default altered the obligations or remedies of Atlas or

25  Avalon, or could be construed to be a revocation of the Power of Attorney by Avalon.

26  *Id.*; *see also* Dkt. # 28 at 15 (Ex. B to 2d Kuhnert Decl., Purchase and Security

27  Agreement § 5) (parties "irrevocably" appoint Avalon as Atlas's attorney in fact with

1   respect to purchased receivables).  Rather, the Notice of Default simply provided notice
2   to plaintiff that Avalon intended to use the remedies provided for by contract.

3          Atlas also argues that 40 U.S.C. § 3133 renders the Power of Attorney invalid.
4   Section 3133(c) provides that a "waiver of the right to bring a civil action on a payment
5   bond under this subchapter is void unless the waiver" is (1) in writing, (2) signed by the
6   person whose right is waived, and (3) executed after the person whose right is waived has
7   furnished labor or material for use in the performance of the contract.  40 U.S.C. §
8   3133(c).

9          Both the Power of Attorney and Purchase and Security Agreement provide Avalon
10  with the ability to compromise, prosecute, or defend any action, claim, case or
11  proceeding relating to the purchased receivables.  Dkt. # 27-1 at 2 (Ex. A to Pl.'s Opp'n,
12  ¶ 3); Dkt. # 28 at 15 (Ex. B to 2d Kuhnert Decl., § 5).  However, these provisions do not
13  constitute an outright waiver of a right to civil action under the Miller Act.  Rather, the
14  assignment of Atlas's rights allows Avalon to step into Atlas's shoes.  *See Estate of*
15  *Jordan v. Hartford Acc. & Indem. Co.*, 120 Wash. 2d 490, 495, 844 P.2d 403 (Wash.
16  1993) ("assignee steps into the shoes of the assignor, and has all of the rights of the
17  assignor").  Under Washington law, an assignment carries with it the rights and liabilities
18  as identified in the assigned contract, as well as all applicable statutory rights and
19  liabilities.[9]  *Puget Sound Nat. Bank v. State Dept. of Rev.*, 123 Wash. 2d 284, 292, 868
20  P.2d 127 (Wash. 1994).

21         Accordingly, the Power of Attorney, section 5 of the Purchase and Security
22  Agreement, and the Assignment created an assignment of Atlas's rights, rather than a
23  waiver of a cause of action under the Miller Act.

24  _____

25         [9] Atlas also argues that the Subcontract prohibited assignment of any funds due under the
26  Subcontract without Schell's written consent.  Dkt. # 27 at 10.  However, under Washington law,
    such terms restricting assignment in an agreement between an account debtor (Schell) and an
27  assignor (Atlas) are ineffective.  RCW 62A.9A-406(d)(1).

1    Atlas also argues that Avalon did not have authority to execute the settlement

2 agreement on its behalf to waive its Miller Act claim under section 3133(c).  Federal

3 courts have been uniform in their insistence that a waiver under section 3133(c) be clear

4 and explicit.  *United States ex rel. Walton Tech., Inc.*, 290 F.3d 1199, 1208 (9th Cir.

5 2002).

6    In May 2013, two months after this case was filed, Schell, Avalon, and Atlas (by

7 Avalon as Atlas's power of attorney) executed the Settlement Agreement, pursuant to

8 which, Schell paid Avalon $495,000 to settle claims related to the purchased accounts

9 receivable.  Dkt. # 19 at 44-45 (Ex. E to Schell Decl.).  The parties agreed to

10          mutually release one another from all past, present, and future demands,
11          causes of action, and claims for relief (including, but not limited to, any and
             all claims against a payment bond pursuant to 40 U.S.C. § 3133 and all
12          expenses, costs, and attorney fees for damages of every kind) whether in
             contract, tort or otherwise, known as well as unknown, anticipated or
13          unanticipated arising out of or in any way related to the Transaction,[10] the
             Letter, and CK One Invoice Nos. CJD102212 and cjd102212-1 as
14          originally issued and reissued.  It is expressly understood by the Settling
             Parties that this Release is intended to cover and does cover not only all
15          known losses and damages, but also further losses and damages and
             personal injury not now known or anticipated, but which may later develop
16          or be discovered, including all of the effects and consequences thereof.
             This Release forever bars any further or additional claims of any kind
17          against one another arising out of and/or relating to the Transaction, the
             Letter, and CK One Invoice Nos. CJD102212 and cjd102212-1 as
18          originally issued and reissued, including any claim with respect to
             equipment specified in the Letter and CK One Invoice Nos. CJD102212
19          and cjd102212-1, as originally issued and reissued, which have not been
20          delivered as of the date hereof.

21

22 *Id.* at 41 (Settlement Agreement § 4.a).  With respect to plaintiff's claim under the Miller

23 Act, the release explicitly and clearly references a section 3133 claim.  The release is in

24 writing and was executed after Atlas furnished labor and material for use in the

25

26 _____

27    [10] "Transaction" is defined as Atlas's assignment of its accounts receivable to Avalon.

ORDER- 15

1  performance of the contract.  Although Atlas did not execute the release, Avalon, as

2  Atlas's power of attorney, signed the release on Atlas's behalf.  The court finds that

3  Avalon was within its scope of authority under the Power of Attorney, Purchase and

4  Security Agreement, and Assignment to settle or compromise any claim related to the

5  purchased accounts receivable, which include plaintiff's Miller Act claim against

6  Schell.[11]  *See Sherman*, 353 U.S. at 218-19 (indicating that the assignees of persons

7  supplying labor or material may sue under the Miller Act).

8           Although the surety was not a party to the Settlement Agreement, the surety's

9  liability on a Miller Act bond is "at least coextensive with the obligations imposed by the

10  Act if the bond is to have its intended effect."  *Walton*, 290 F.3d at 1206.  "Thus, the

11  liability of a surety and its principal on a Miller Act payment bond is coextensive with the

12  contractual liability of the principal only to the extent that it is consistent with the rights

13  and obligations created under the Miller Act."  *Id.*

14           Nevertheless, the court's analysis above applies equally to the surety because of

15  the assignment.  Atlas assigned all of its rights to claims, including the ability to settle

16  claims relating to the three invoices, to Avalon.  Plaintiff's Miller Act claim against the

17  surety (and Schell) was to recover the labor and services provided for in those three

18  invoices.  Avalon, acting as Atlas's power of attorney, settled all claims relating to any

19  accounts receivables assigned to Avalon, including "all claims against a payment bond

20  pursuant to 40 U.S.C. § 3133," which is plaintiff's Miller Act claim against Hanover.

21  The court understands that Atlas did not view the settlement terms to be favorable to it.

22  However, it cannot escape the legal consequences of signing the Power of Attorney,

23  Assignment, and Purchase and Security Agreement.

24

25  _____

26           [11] The court notes that it would appear that the Settlement Agreement would also release
   Atlas from any claims held by Avalon related to the accounts receivables, or other costs and
27  expenses related to the accounts receivable.

1    Accordingly, the court DENIES plaintiff's motion for partial summary judgment,

2    and GRANTS defendants' motion for summary judgment as to plaintiff's Miller Act

3    claim.

4    **C. Breach of Contract, Quantum Meruit, and Unjust Enrichment**

5    Plaintiff's first, second, and fifth causes of action for breach of contract, quantum

6    meruit, and unjust enrichment, respectively, rely on the same alleged failure or refusal of

7    Schell to pay Atlas for labor, services and materials that underpin plaintiff's Miller Act

8    claim.  Thus, these claims also relate to the accounts receivables that were assigned to

9    Avalon and settled.  For the same reasons explained above, the court GRANTS

10   defendants' motion for summary judgment as to these claims.

11   **D. State Law Claims for Conversion, Fraudulent Misrepresentation, Negligent**
12       **Misrepresentation, and Trade Libel**

13   Defendants move the court to dismiss plaintiff's remaining state law claims for

14   conversion, fraudulent misrepresentation, negligent misrepresentation, and trade libel

15   because plaintiff cannot present a prima facie case.  Dkt. # 18 at 20-24.  Plaintiff has not

16   provided any legal argument in opposition to defendants' motion regarding the state law

17   claims.  Dkt. # 27.  However, Mr. Kuhnert has provided a declaration addressing the state

18   law claims.  Dkt. # 28.

19   "Conversion is the unjustified, willful interference with a chattel which deprives a

20   person entitled to the property of possession." *In re Marriage of Langham*, 153 Wash. 2d

21   553, 564, 106 P.3d 212 (Wash. 2005).  Mr. Kuhnert contends that the power of attorney

22   was void and that the assignment of claims was revoked.  Dkt. # 28 at 5 (2d Kuhnert

23   Decl.).  These are legal conclusions that the court has disregarded.  The contracts

24   analyzed above control, and the court has concluded that the Assignment, Purchase and

25   Security Agreement, and Power of Attorney were effective and provided Avalon with the

26   authority to settle claims related to the purchased accounts receivable on Atlas's behalf.

27   Additionally, under Washington law, Schell properly paid Avalon to discharge its

1    obligation.  *See* RCW 62A.9A-406(a) ("After receipt of the notification [of assignment],

2    the account debtor may discharge its obligation by paying the assignee and may not

3    discharge the obligation by paying the assignor.").  Accordingly, summary judgment is

4    appropriate as to this claim.

5         Under Washington law, a fraud claim requires proof by clear, cogent, and

6    convincing evidence of: (1) a representation of existing fact, (2) its materiality, (3) its

7    falsity, (4) the speaker's knowledge of its falsity, (5) the speaker's intent that it be acted

8    upon by the person to whom it is made, (6) ignorance of its falsity on the part of the

9    person to whom the representation is addressed, (7) the latter's reliance on the truth of the

10   representation, (8) the right to rely upon it, and (9) consequent damage.  *Elcon Const.,*

11   *Inc. v. E. Wash. Univ.*, 174 Wash. 2d 157, 166, 273 P.3d 965 (Wash. 2012).

12        Mr. Kuhnert contends that "Schell admitted in discovery that they did not have

13   money to complete the contract when they made their bid to the Engineers."  Dkt. # 28

14   (2d Kuhnert Decl.) at 5.  However, plaintiff has not provided the court with the discovery

15   response as required by Federal Rule of Civil Procedure 56(c)(1).  Accordingly, the court

16   has disregarded plaintiff's interpretation of the purported discovery response.  Mr.

17   Kuhnert also asserts that "Schell falsely claimed to have completed their submittals

18   without having even started them."  *Id.* Mr. Kuhnert asserts that plaintiff was justified in

19   relying on this statement because of the "position of trust with [its] contractor on a

20   respectable government project."  Dkt. # 28 at 5.  Plaintiff has not provided any legal

21   authority for the conclusion that that a subcontractor is in a position of trust with the

22   prime contractor, and the court has found none.  Mr. Kuhnert also asserts that "Schell

23   knew perfectly well that its statements were false, that the bids made to the government

24   were all outright and shameless lies.  Schell also knew that it lied and that it had not

25   started its engineering submittals when they came crawling to beg Atlas for merciful

26   help.  Schell lied to induce [Atlas] to provide goods and services which it never intended

27   to pay for."  Dkt. # 28 at 5.  Mr. Kuhnert does not have personal knowledge of what

1   Schell knew or did not know or what it intended or did not intend to do.  Nor has he

2   provided the proper factual foundation to substantiate these speculative and conclusory

3   statements.  These assertions are inadmissible.  Defendants have met their initial burden

4   on summary judgment, and, when stripped of the inadmissible statements, the court finds

5   that plaintiff has failed to set forth specific facts showing that there is a genuine issue of

6   fact for trial.  Accordingly, summary judgment is appropriate for plaintiff's fraud claim.

7        Under Washington law, to prove negligent misrepresentation, a plaintiff must

8   prove by clear, cogent, and convincing evidence that:  (1) defendant supplied information

9   for the guidance of others in their business transactions that were false, (2) defendant

10  knew or should have known that the information was supplied to guide plaintiff in

11  business transactions, (3) defendant was negligent in obtaining or communicating false

12  information, (4) plaintiff relied on false information supplied by defendant, (5) plaintiff's

13  reliance on false information supplied by defendant was justified—that is, reliance was

14  reasonable under the surrounding circumstances, and (6) the false information was the

15  proximate cause of damages to plaintiff.  *Lawyers Title Ins. Corp. v. Baik*, 147 Wash. 2d

16  536, 545, 55 P.3d 619 (Wash. 2002).

17       Mr. Kuhnert relies on the same assertions for his negligent misrepresentation

18  claim as he does for his fraudulent misrepresentation claim.  Accordingly, the court also

19  finds that plaintiff has failed to set forth specific facts showing that there is a genuine

20  issue of material fact for trial, and summary judgment is appropriate.

21       The parties have not cited, and the court is not aware of, any Washington Supreme

22  Court case acknowledging a claim for trade libel, also referred to as product

23  disparagement.  However, "a Washington state appellate court, citing the Restatement of

24  Torts, recognized that those whose products are disparaged face a higher burden of proof

25

26

27

ORDER- 19

than do defamation plaintiffs."[12]  *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 820 (9th Cir. 1995) (citing *Waechter v. Carnation Co.*, 5 Wash. App. 121, 485 P.2d 1000, 1003-04 (1971)).  To establish a claim for trade libel, "a plaintiff must allege that the defendant published a knowingly false statement harmful to the interests of another and intended such publication to harm the plaintiff's pecuniary interests."  *Id.* (citing Rest. (2d) of Torts § 623A).  "Accordingly, for a product disparagement claim to be actionable, the plaintiff must prove, *inter alia*, the falsity of the disparaging statements."  *Id.*

The only evidence before the court relating to plaintiff's trade libel claim is its response to interrogatory 14:

> Schell made false and defamatory statements to Avalon that Atlas was in breach of duties when in fact Atlas was not.  Schell undertook a project and ordered goods and services which it had not the ability to pay for.  It further attempted to skirt its obligation to pay Atlas by knowingly and intentionally relying on an invalid power of attorney and paying Avalon amounts rightfully owed to Atlas.  Moreover, even if the power of attorney was in any way valid, it did not cover all the equipment and services provided to Schell.

Dkt. # 20 at 21 (Ex. B to Godwin, Interrog. 14).  The first sentence appears to be the only statement relevant to the requirements for a finding of trade libel.  However, such a conclusory statement falls far short to demonstrate an issue of material fact to survive summary judgment.  Additionally, plaintiff has not produced any admissible evidence that Schell knew that the statement, that Atlas breached its contract, was false.  Accordingly, summary judgment is appropriate on this claim.

**E.  Attorney's Fees Request**

Schell argues that it is entitled to attorney's fees and costs pursuant to the subcontract if it prevails on its motion.  Dkt. # 18 at 23.  However, the Settlement

---

[12] The court assumes, without deciding, that Washington recognizes a claim for trade libel.

1   Agreement also released the parties from "costs, expenses, and attorney fees incurred in

2   pursuing any possible claim or cause of action."  Dkt. # 19 at 39 (Ex. E to Schell Decl.,

3   Settlement Agreement ¶ 2.c).  Accordingly, the court DENIES Schell's request for

4   attorney's fees.

5                                           **IV. CONCLUSION**

6          For all the foregoing reasons, the court GRANTS defendants' motion for summary

7   judgment, and DENIES plaintiff's motion for partial summary judgment.  Although the

8   court did not address individual defendants Andy Schell and Jane Doe Schell

9   individually, the court's findings apply equally to them as plaintiff has failed to

10  demonstrate any genuine issue of material fact with respect to any of its claims against

11  the individual defendants.  The Clerk is DIRECTED to enter judgment against plaintiff

12  and in favor of defendants.

13         Dated this 24th day of April, 2014.

14

15

16

17

18                                          The Honorable Richard A. Jones
                                            United States District Judge
19

20

21

22

23

24

25

26

27